UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                              Case No. 15-20652-04

vs.

                              HON. GEORGE CARAM STEEH

D-4 COREY BAILEY,

        Defendant.
_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS [DOC. 909]

This matter is before the court on defendant Corey Bailey's motion to suppress evidence seized by law enforcement during six separate incidents, which correspond to overt acts charged in the indictment. The court held an evidentiary hearing on April 25, 2018. For the reasons stated in this order, defendant's motion to suppress is denied.

I.     July 23, 2004 (Overt Act 104) Stop and Search of Bailey

The government informed the court and the defendants that it will not be presenting any evidence of this act at trial. Therefore, the suppression issue as to this act is moot.

II.    May 5, 2005 (Overt Act 102) Detention of Bailey

The government informed the court and the defendants that it will not be presenting any evidence of this act at trial. Therefore, the suppression

issue as to this act is moot.

III. <u>April 13, 2007 (Overt Act 95) Search of 14117 Collingham</u>

On April 13, 2007 at about 5:30 p.m., Amanda Pitts told the desk officer at the Fifth Precinct of the Detroit Police Department that she was parking her car when Corey Bailey pulled up in a Dodge van and backed into the front of her vehicle, causing damage. Sergeant Corey Karssen ran a LEIN check on Bailey and discovered a bench warrant out of the 36th District Court for failure to appear for a misdemeanor. The LEIN system listed Bailey's address as 14117 Collingham, Detroit, MI.

Karssen testified that on April 13, 2007, he went to 14117 Collingham to investigate Bailey for destruction of property. Karssen testified that he was met at the front door by Lakisha Bembry. Ms. Bembry told him that she lived at the address and allowed the officers entry. When asked, Ms. Bembry stated that Bailey lived there and she was not sure if he was home. Ms. Bembry then consented to the officers checking the location for Bailey.

Ms. Bembry testified that the apartment was rented by a Ms. Smith, who allowed Bembry to live there. Ms. Smith was about 70 years old at the time and was also Corey Bailey's great aunt. Bembry could not definitively say if Bailey lived there or if he just stayed there sometimes. Bembry testified that Ms. Smith was the person who answered the door when the officers knocked and that she declined them entry unless they had a

warrant. According to Bembry, the officers entered the house without permission.

As Karssen looked through the house for Bailey, he smelled suspected marijuana coming from the basement. Karssen and Officer Carlos Chapman went to the basement and observed Bailey lying on an air mattress in a room with no door. A female, Moniqua Jones, was in the room with Bailey. Karssen testified that he walked around the air mattress and observed a small shotgun lying on the floor between the mattress and the wall. Karssen further testified that Officer Bickley placed Bailey into custody. Karssen then recovered the weapon from the floor and observed and confiscated eight plastic wraps of suspected crack cocaine and one zip lock of suspected marijuana which was in plain view on the television stand. Descriptions of the room given by Karssen and Jones make it clear that the gun and the drugs were both within arm's reach of Bailey as he lie on the bed.

Corey Bailey's testimony differed from that of Sergeant Karssen with regard to the visibility of the gun and drugs. Bailey testified that his gun was stored in a locked cabinet inside the wall and that the police opened the door and found the gun. He also testified that the crack cocaine was not in plain view, but rather was stored in a red opaque Swisher tube on the television stand. Finally, Bailey disputed the amount of drugs found,

estimating that there was approximately a tenth of a gram of crack, for his personal use.

Bailey was interrogated by Sergeant Boyle at the precinct after he signed a waiver of constitutional rights statement. He admitted that the crack found when he was arrested was his, but that he was not selling it. He also admitted that the gun that was found was his.

Bailey was charged with possession of the gun. He had a lawyer in his state court case and was given the police report stating that Bembry gave officers permission to enter the house. Bailey's lawyer filed a motion to suppress contesting consent based on the fact that officers pushed past Ms. "Bembry who was no[t] a full time resident of the home and searched the basement where Mr. Bailey resides." There is no mention of Ms. Smith in the motion to suppress.

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). "[I]t is the government's burden, by a preponderance of the evidence to show through clear and positive testimony, that . . . valid and voluntary consent to [a] search was obtained." *United States v. Worley*, 193 F.3d

380, 385 (6th Cir. 1999). When considering whether consent was voluntary, the court should consider the totality of the circumstances. *United States v. McCauley*, 548 U.S. 440, 446 (6th Cir. 2008).

The court finds Sergeant Karssen's testimony to be credible that he would not have entered the premises without consent and that Ms. Bembry gave her consent. Even if Ms. Bembry did not have actual authority to consent to the search, the Fourth Amendment is not violated if the police rely in good faith on a third party's apparent authority to consent to a search. *See United States v. Hunyady*, 409 F.3d 297, 303 (6th Cir. 2005). Ms. Bembry testified that she resided at the premises, thus giving her actual, or at least apparent, authority to consent to a search of the premises. *See United States v. Hudson*, 405 F.3d 425, 444 (6th Cir. 2005) (agreeing girlfriend had apparent authority where she said she lived in house).

Ms. Bembry's own testimony is that it was Ms. Smith who answered the door to the officers and declined to give her consent. The court was struck by the fact that Ms. Bembry could not recall the details of the incident with clarity, which is understandable given that it occurred eleven years prior to her testimony and she did not take any contemporaneous notes of what occurred. The only memory that Bembry recalled without hesitation was that Ms. Smith's demeanor was "stern" with the police and

that she demanded that they give her a warrant before she would let them in. The court finds it unlikely that a 70 year old woman would speak to the police in this manner. In addition, Bailey addressed the issue of consent in his state court case and argued to that court that Bembry lacked authority to consent, but he did not state that Smith was the person who interacted with the police rather than Bembry.

The court's assessment of Sergeant Karssen's testimony about where he saw the gun and drugs is that it was also credible. Mr. Bailey's testimony, that the firearm was locked in a cabinet inside the wall and that the crack was hidden inside a tube and not in plain view, is self-serving and lacked indicia of reliability.

The court finds that the officers had consent to search 14117 Collingham and had probable cause to arrest Bailey for the gun and the drugs. The gun and drugs were in plain view, and in any event were within arm's reach of Bailey as he lie on the bed.

IV. <u>August 30, 2007 (Overt Act 94) Search of Bailey's Person</u>

On August 30, 2007, at approximately 12:15 a.m., Officer Howard Sweeney, Sergeant Karssen and Officer James Oshea were traveling on Manning Street when they observed a person in the upstairs window of 14560 Manning St. Sweeney knew the location to be a vacant dwelling. As the officers approached the location, Ms. Jacqueline Swanger came out

of the side door and was detained by Officer James Oshea. Karssen and Sweeney entered and began to clear the location. Karssen detained three females and one male upstairs. Sweeney discovered Bailey hiding behind the furnace and water heater in the basement. Sweeney arrested Bailey for entering without permission ("EWOP"). During Officer Sweeney's search of Bailey incident to arrest, he recovered one knotted clear plastic baggie containing two clear plastic wraps of suspected crack cocaine sticking out of the rear of Bailey's boxer shorts. The other individuals were issued tickets and were released.

Bailey testified that he did have drugs on his person, but that they were hidden in his buttocks and were not visible. He contends that Sweeney cuffed him, brought him upstairs, lined all of the individuals up on their knees, and searched them. Bailey testified that Karssen and Sweeney pulled down his pants and found the plastic bag of crack in his buttocks.

Bailey moves to suppress the drugs recovered on August 30, 2007. The court finds the testimony of Officer Sweeney, that the bag containing drugs was visible on Bailey's person, to be credible. "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 339 (2009). "The exception derives from interests in officer safety and evidence preservation that are typically

implicated in arrest situations." *Id.* Entering a premises without permission is a misdemeanor under Michigan law, *see* Michigan Penal Code § 750.115, giving officers a justification to arrest Bailey. Officer Sweeney recovered crack cocaine from Bailey's person, which is within the scope of a search incident to arrest. *Id.*

V. <u>October 27, 2009 (Overt Acts 73-74) Vehicle Stop</u>

On October 27, 2009, officers from the West Virginia Metro Drug Enforcement Network Team Task Force were conducting surveillance at the Greyhound Bus station in Charleston, WV based on an on-going narcotics trafficking investigation at that location. At approximately 1:30 a.m., Officer Napier radioed that a male individual tried to enter the bus station, but the door was locked. The male got back into a dark colored vehicle and drove off. Hackney testified that it was common for people involved in the opioid trade to come to the bus station and buy a ticket just before the last bus of the day was leaving. Officer Hackney's team followed the vehicle and noticed that the rear brake light was out. Hackney radioed for Officer Schuman, who was acting as uniform assistance, to conduct a traffic stop of the vehicle for defective equipment.

Hackney continued to follow the vehicle as it circled around the Greyhound station and stopped in the middle of the road outside the bus loading area. Officer Schuman had not arrived yet, so Hackney and his

team put on their badges and approached the stopped vehicle. Hackney testified that when the front passenger (Corey Bailey) put his window down, he had a surprised look. While Hackney talked to the female driver, Bailey and the rear passenger began to move around and place their hands in their pants' pockets. They did not follow Hackney's directions to stop moving and to keep their hands where the officers could see them.

Hackney testified that he told Bailey to step out of the vehicle. Hackney noticed Bailey was sweating profusely and he explained he was not feeling well. Hackney patted him down for weapons and none were found. Hackney then asked his name, to which he falsely replied "Dwayne Pruitt." The other male passenger exited the vehicle and was patted down by Detective Welsh. He identified himself as Devon McClure. The female identified herself to Officer Hackney as Justine Parker. Ms. Parker gave verbal consent to search her vehicle.

Detective Keven Allen searched the trunk and found a green jacket and black duffle bag. Ms. Parker hesitated and then said the bag was not hers. Mr. McClure said the bag was his and that it contained a small amount of marijuana. Allen searched the bag and located $3,100 in currency inside a tennis show as well as a bag of suspected marijuana.

A summons for possession of marijuana was issued to Mr. McClure and his money was seized. The driver was not given a ticket for defective

equipment. Bailey was not cited, and all three individuals were released. Officers later determined that Mr. Pruitt was Corey Bailey.

Defendant moves to suppress evidence that Bailey gave a false name to law enforcement. The government argues the vehicle stop was constitutional as an investigational stop because the officers had probable cause to believe a traffic violation had occurred. *See Whren v. United States*, 517 U.S. 806, 810 (1996). West Virginia Code Sections 17C-15-1(a) and 17C-15-18(b) provide that it is a misdemeanor to drive a vehicle that does not contain properly functioning brake lights.

Corey Bailey testified that as far as he knew, the brake light on Ms. Parker's vehicle was not out, however he could not say this for certain. Officer Hackney testified that the brake light was out, and he put that in his report of the incident. Defendant questioned Hackney about a Canine Use report he prepared and signed in 2013 that was later discovered to be false. Hackney admitted that he put false information in the report, for which he was reprimanded. He explained that he created the report at the end of each month instead of daily, and had to use forms and logs to make sure he was not missing any time in which his police dog was used. He put in his report that he used his dog to sniff for drugs during a particular investigation, when in fact he did not. In this case, Hackney prepared his report on October 28, 2009, the day following the incident. The court does

not believe that Hackney's dishonesty in accounting for the Canine Use report casts doubt on his testimony or his report of the vehicle stop involving Bailey.

This incident was a lawful encounter because the officers had probable cause to believe that a traffic infraction had been committed. During the traffic stop Bailey gave a false name to officers. No suppression is warranted.

VI. February 8, 2012 (Overt Acts 65-66) Search of Apartment and Bailey's Person

On February 8, 2012, law enforcement went to the apartment of Adam Halstead based on previously obtained information that he had individuals staying with him who were selling pills illegally. Detectives Allen, Petty, Higginbotham and Carper went to Halstead's apartment located at 27 Hambrick Lane, Apartment D, Cross Lanes, West Virginia to conduct a knock and talk interview. When Detective Allen knocked, the door was answered by Mr. Halstead and two other individuals. Allen identified himself and stated he had information that people were using the apartment to sell drugs. Mr. Halstead gave written consent to search the apartment. The other two individuals stated they did not live in the apartment and were just visiting.

One of the individuals identified himself as Eric Brown (he was later

identified as Corey Bailey). Detective Petty had stopped this individual on numerous occasions coming and going from the Greyhound Bus Station and knew that Eric Brown was not the individual's name, though he could not remember his real name. The second individual was Tyrone Hawkins.

Detective Allen testified that he asked for and received verbal consent to pat down the two individuals for weapons or other contraband. Detective Allen felt a large amount of money in Bailey's front left pocket. Bailey said he had around $2,000 and gave consent to examine the currency and continue the search of his person.

As Allen continued his search of Bailey, he felt a plastic bag containing an unknown hard substance in the crease of Bailey's buttocks. Bailey jerked away and put his hand to his buttocks area. Bailey became agitated and struggled. Allen informed Bailey he was under arrest. Allen placed the handcuffs in front to prevent Bailey from accessing his buttocks. As Allen walked Bailey out of the apartment, Bailey reached into his front left pocket and pulled out the currency and threw it in the air. The currency hit Detective Petty in the face, and Bailey apologized and explained he was trying to give the money to his friend. Detective Higginbotham collected the currency and Allen informed Bailey he was seizing the money.

At the station, Bailey voluntarily removed the pills from his body. Bailey told Higginbotham the bag contained "about 54 pills." Allen collected

the bag which contained approximately 53 Opana pills.  While walking Bailey to the courthouse, Allen and Higginbotham were talking about the price of Opanas.  Without being questioned, Bailey stated he sold Opana pills for $40 a pill and was aware they were being sold for up to $80 a pill.  Bailey also said he was mad because he could have taken "10 stacks" back to Detroit if the police had not intervened.

Bailey argues the detectives entered the apartment without lawful consent and then searched him without consent.  The count finds that the search of the apartment was done with consent because Halstead signed a valid written consent form.  As for searching Bailey's person, Allen and Bailey both testified that Bailey consented to an initial search for weapons.  Having found a large amount of currency in Bailey's pocket, knowing that Bailey gave an incorrect name, and working from a tip that people were selling illegal drugs from the apartment, Allen asked Bailey if he could do a further search of his person.  Allen testified that this was his regular practice in such situations and that Bailey gave further consent.  Bailey, however, testified that he did not consent to a more intrusive search of his buttocks and that he withdrew any consent he might have given when the officer searched his buttocks.  The court finds Allen's testimony to be credible.

Defendant moves to suppress the currency, the alias and the drugs.

The court finds that Halstead gave consent to search the apartment, Bailey voluntarily consented to the search of his person, and Bailey also voluntarily turned over the drugs at the police station. Defendant's motion to suppress the evidence from this incident is denied.

IT IS SO ORDERED.

Dated: May 9, 2018

                                      s/George Caram Steeh
                                      GEORGE CARAM STEEH
                                      UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on May 9, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---